## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DANIEL SANCLEMENTE Derivatively on Behalf of RESIDEO TECHNOLOGIES, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MICHAEL G. NEFKENS, JOSEPH D. RAGAN III, NICCOLO DE MASI, PAUL DENINGER, ROGER FRADIN, NINA RICHARDSON, JACK LAZAR, SHARON WIENBAR, and ANDREW TEICH, | ) Case No. ) ) ) ) |
| | ) **JURY TRIAL DEMANDED** |
| Individual Defendants, -and- | ) ) ) ) |
| RESIDEO TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) |
| Nominal Defendant. | ) ) |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Daniel Sanclemente ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

1

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Resideo Technologies, Inc. ("Resideo" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Resideo's reputation, goodwill, and standing in the business community and has exposed Resideo to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Resideo in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by Resideo's directors and officers from October 29, 2018 through the present (the "Relevant Period").

3.      Resideo provides critical comfort, thermal, and security solutions primarily in residential environments in the United States and internationally. It offers home products, services, and technologies, including temperature and humidity control, water, air, and software solutions; and residential thermal solutions ("RTS"), such as boiler products, storage gas water heating solutions, ducted solutions, and thermal adjacency solutions. The company also provides security solutions comprising security panels, sensors, peripherals, wires and cables, communication devices, video cameras, awareness solutions, cloud infrastructure, installation and maintenance tools, and related software products. Resideo markets its products under the Honeywell Home brand.

4.      In addition, the company distributes security products comprising video surveillance products, intrusion, and access control products; and other products that include fire and life safety, as well as wire, networking, and professional audiovisual systems to contractors that service non-residential and residential end-users. Resideo was incorporated in 2018 and is

headquartered in Austin, Texas.

5.     Resideo was formerly part of Honeywell International Inc. ("Honeywell"), a multinational technology and manufacturing company. Resideo broke off from Honeywell on October 29, 2018 and began trading on the New York Stock Exchange ("NYSE") (the "Spin-Off"). In connection with the Spin-Off, over 65 million Resideo shares were sold for over $1.4 billion.

6.     Prior to the Spin-Off, and during the Relevant Period, the Individual Defendants touted the Company's business prospects to the investing public, making extensive statements about the Company's activities, and assuring investors that Resideo was on track to flourish as a stand-alone company, when in fact these statements did not disclose major problems at the Company, as outlined below.

7.     From the time Resideo came into existence as its own entity, the Company faced major problems, which included: (1) the Company had few to no expert engineering personnel needed to control the costs of certain components, as these professionals had been taken by Honeywell prior to the Spin-Off; (2) the Company faced problems with its supply chains and inventory, resulting in backorders and product shortages; (3) certain of the Company's security products, as well as the Company's T-Series line of thermostats, which made up the core of the Company's residential thermostats portfolio, were rapidly becoming obsolete in the face of competing products that were more technologically advanced; (4) the Company's Total Connected Comfort application (the "TCC App"), which applied to T-Series thermostats and other types of thermostats, had serious problems; (5) Contractual liabilities resulted from the Company's failure to deliver on contracts with certain Original Equipment Manufacturers ("OEM"), including ADT Inc. ("ADT"); (6) as a result of the Spin-Off, the Company lost all of the advantages that had come with operating as a part of Honeywell, including access to Honeywell's considerable bargaining

power and economies of scale; (7) the Company lacked the professionals, expertise, or technology to address these problems, or to develop products in the pipeline (including promises Individual Defendants made regarding to those products), including "Project GRIP," a next-generation security platform, and "Project STORM," a systems integration tool; and (8) the Company lacked managerial and financial cohesion, resulting from Resideo's nature as an amalgamation of largely of disconnected business segments that did not have a history of operating together.

8.      Indeed, the Spin-Off itself was intended to benefit Honeywell at the expense of Resideo. In connection with the Spin-Off, Resideo was required to: (1) indemnify Honeywell for up to $140 million annually of Honeywell's asbestos-related environmental liabilities; (2) pay Honeywell a one-time, debt-funded dividend of approximately $1.2 billion; and (3) pay Honeywell tens of millions of dollars annually in royalties stemming from Resideo's use of Honeywell's various trademarks. These major obligations would make it very difficult for Resideo to be innovative and increase its margins.

9.      In March 2019, the truth was revealed when the Company lowered its 2019 financial guidance and declared a 20% decrease in profit in its Product & Solutions segment due to "one-time spin-related costs."

10.     After the close of trading on October 22, 2019, the Company disclosed more negative financial news, including declining sales of non-connected thermostats. The Individual Defendants, as to the causes of these declines, stated in pertinent part, "[w]e believe a poor pre-spin cutover from the prior generation of non-connected thermostats to the T-Series line impacted the adoption of mid-level T-Series thermostats. The cutover effects became markedly more pronounced in the third quarter after the prior generation of non-connected thermostats were discontinued."

11.     In total, once the truth of the Company's financial situation was revealed to the market, the price of the Company's stock dropped over 39% in value, relative to the Company's stock price of $28.00 per share at the time of the Spin-Off on October 29, 2018, causing Resideo investors to lose of over $1.3 billion. Thus, The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

13.     As detailed herein, and as alleged in the ongoing federal securities class action in the District of Minnesota styled *In Re Resideo Technologies Inc. Securities Litigation* Case No. 19-cv-02863, (the "Federal Securities Class Action"), Resideo's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of

the United States that it would not otherwise have such jurisdiction.

16.     This Court has personal jurisdiction over each of the Individual Defendants because each Defendant is either a corporation incorporated in this District or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Individual Defendants have received substantial compensation in this District by engaging in various activities that had an effect in this District. Venue is proper in this District because the Company and the Individual Defendants have conducted business in this District and Individual Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

18.     Plaintiff Daniel Sanclemente is and has continuously been a stockholder of Resideo during the wrongdoing complained of herein.

### Nominal Defendant

19.     Defendant Resideo is a Delaware corporation with its principal executive offices at 901 E 6th Street, Austin, Texas 78702. Resideo's shares trade on the NYSE under the ticker symbol "REZI."

### Individual Defendants

20.     Defendant Michael G. Nefkens ("Defendant Nefkens") was the Company's chief executive officer ("CEO") and President from 2018 until he resigned on May 27, 2020. For the fiscal year ended December 31, 2019, Defendant Nefkens received $6,353,165 in total compensation from the Company.

21.     Defendant Joseph D. Ragan III ("Defendant Ragan") served as the Company's

6

chief financial officer ("CFO") from 2018 until he resigned on November 6, 2019. For fiscal year 2019, Defendant Ragan received $1,958,301 in total compensation from the Company.

22.     Defendant Niccolo de Masi ("Defendant de Masi") served as the Company's Chief Information Officer ("CIO") from February 2019 until he was terminated on March 13, 2020. He was also President of Products & Solutions and a director from February 2019 and October 2018, respectively, until he stepped down from these positions on January 6, 2020. For the fiscal year ended December 31, 2019, Defendant de Masi received $4,010,936 in total compensation from the Company.

23.     Defendant Paul Deninger ("Defendant Deninger") has been a Company director since 2018. He also serves as a member of the Audit Committee and the Innovation and Technology Committee. For the fiscal year ended December 31, 2019, Defendant Deninger received $234,999 in total compensation from the Company.

24.     Defendant Roger Fradin ("Defendant Fradin") has served as the Chairman of the Board since 2018. He also serves as a member of the Innovation and Technology Committee. For the fiscal year ended December 31, 2019, Defendant Fradin received $394,999 in total compensation from the Company.

25.     Defendant Nina Richardson ("Defendant Richardson") has been a director since 2018. For the fiscal year ended December 31, 2019, Defendant Richardson received $228,321 in total compensation from the Company.

26.     Defendant Jack Lazar ("Defendant Lazar") has served as a Company director since 2018. He also serves as the Chair of the Company's Audit Committee, and as a member of the Innovation and Technology Committee. For the fiscal year ended December 31, 2019, Defendant Lazar received $240,821 in total compensation from the Company.

27.     Defendant Sharon Wienbar ("Defendant Wienbar") has served as a Company director since 2018. She also serves as the Chair of the Company's Compensation Committee, and as a member of the Audit Committee. For fiscal year 2019, Defendant Wienbar received $239,999 in total compensation from the Company.

28.     Defendant Andrew Teich ("Defendant Teich") has been the Company's lead independent director since 2018. He also serves as the Chair of the Company's Innovation and Technology Committee. For the fiscal year 2019, Defendant Teich received $424,906 in total compensation from the Company.

29.     Collectively, Individual Defendants Nefkens, Ragan, De Masi, Deninger, Fradin, Richardson, Lazar, Wienbar, and Teich, are referred to herein as the "Individual Defendants."

30.     The Individual Defendants, because of their positions with Resideo, possessed the power and authority to control the contents of Resideo's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

31.     Resideo was initially part of Honeywell's business segments, including portions of Honeywell's home and building technologies business and its safety and productivity solutions

business. Honeywell is an international diversified technology and manufacturing conglomerate. Among other things, Honeywell develops and provides aerospace products and services, electronics and advanced materials, specialty chemicals, petrochemical refining technology, and productivity and security technologies for buildings and industries.

32.     The entity that would eventually become Resideo had its beginnings in October 2017 when Honeywell announced plans to spin-off its homes and global distribution business segment. During this period, Honeywell was also in the process of spinning off several of its other business segments into standalone companies, including its transportation business. The reason for some of these spin offs was so that the Company could avoid billions of dollars of historically accumulated asbestos liabilities by requiring its spun-off entities to indemnify Honeywell for some of these liabilities.

**Resideo's Obligations to Honeywell**

33.     In October 2018, Honeywell entered into certain agreements with Resideo. This included an indemnification agreement with Resideo in connection with Honeywell's asbestos-related liabilities which required Resideo to pay Honeywell for 90% of amounts related to Honeywell's legacy asbestos liabilities, including environmental claims and remediations, as well as toxic tort claims related to exposure to asbestos. These payments would be up to $140 million per year until 2043. Additionally, Resideo entered into a 40-year trademark agreement with Honeywell. Under the terms of the agreement, Resideo would be required to pay to Honeywell, in the form of royalties, 1.5% of the proceeds of any Honeywell Home products Resideo sold. Honeywell also required Resideo to make a one-time payment to Honeywell in the amount of $1.2 billion related to the Spin-Off. In order to make payment, the Resideo entered into an $800 million loan and took on $400 million in senior unsecured notes (together, the above agreements are referred to as "the Honeywell Agreement").

34.     The burden of debt Resideo took on in connection with the Honeywell Agreement meant that it was essential the spin-off of the Company went smoothly, so that the Company was profitable enough to service these debts. To the contrary, the Company ran into a multitude of major problems after the Spin-Off on October 29, 2018, which jeopardized the Company's ability to meet the debts under the Honeywell Agreement.

35.     The Company as a whole was made up of separate and incoherent Honeywell business segments that had no history of working together, resulting in management tensions and problems. The formation of Resideo involved Honeywell spinning off sections of its environmental & energy solutions, security & fire, building solutions, ADI, Safety Solutions, and productivity solutions business. However, only the ADI business unit was fully passed on to Resideo. Honeywell kept parts of the other business, which are competitors with some of Resideo's business components.

36.     The new Company also lacked certain essential professionals, namely, value engineers. For each of the segments Honeywell gave to Resideo, Honeywell kept its value engineering teams, which meant there were no cost controls for certain electrical components, packaging, and raw materials.  The Company's lack of value engineers caused damage throughout the Company's supply chains, even before the completion of the Spin-Off, leading to backorders, inventory shortages, and the loss of customers. For example, certain of the Company's products would be on backorder for long periods of time, and the severity of this problem began to increase during the beginning of 2019. The Company's supply chain issues grew worse after the Spin-Off, resulting in backorders for months and numerous customer complaints.

37.     Resideo's loss of access to Honeywell's resources following the Spin-Off also meant that Resideo would no longer receive the benefits of the substantial leverage and negotiating

power that Honeywell was afforded as large multinational group, including Honeywell's ability to negotiate favorable agreements for raw materials and financial arrangements.

38.     The Company also faced a series of technical problems related to its TCC App, which provides the user interface for 30 to 40 different varieties of Resideo's internet app-controlled, or "connected", thermostats. By the middle of 2018, the TCC App was meeting the threshold of users that it could hold without experiencing crashes and service outages. The threshold was met in November 2018, resulting in weekly outages and numerous customer complaints.

39.     The Company also faced problems related to its "Project GRIP," a control panel designed to combine various security systems and sensors into one system. One version of Project GRIP was being designed for use by ADT, one of the Company's largest clients, and the Company was contractually obligated to provide to ADT its version of Project GRIP before the general customer version was made available. However, Project GRIP was extremely slow to come to fruition, which potentially harmed the relationship between the Company and ADT.

40.     The Company had only sent ADT a beta version of Project GRIP, which was meant to have been ready for production in February 2019. Due to such delays, the Company incurred millions of dollars in contract penalties pursuant to its contract with ADT, and likely lost millions of dollars in revenue by failing to produce Project GRIP in a timely fashion.

41.     Another Company project facing major challenges was the Company's Project STORM, a systems integration tool that would supposedly "integrate all dimensions of home wellness." The technology needed to complete this project was years away from being developed and the deadlines set by the Company's management for the completion of the project could not be met.

42.     The Company's core T-Series line of thermostats also had major technology-related issues. T-Series thermostats were composed of various aging technologies that were outdated before the Spin-Off. Certain of the Company's security products utilized aged technology and were behind competing products with more advanced technology. The market for thermostats, for which Resideo and Honeywell held the prime market share, was being outcompeted by companies with more advanced technologies. Certain models in the T-Series line released in 2019 were approximately 18 months late to the market due to a lack of certain professionals to assist in the speed in bringing these products to the market. Certain T-Series line models did not possess high range, compared to competing products, despite Individual Defendants touting the range of these products.

43.     Due to the above issues, it was predictable that Resideo would not meet its financial guidance given during the Relevant Period. Despite this, the Individual Defendants continually reaffirmed the Company's guidance and affirmed Company's ability to meet its guidance, to the investing public.

44.     Additionally, the Individual Defendants were well aware of the multitude of serious issues pertaining to Resideo's products, governance, operations, and overall business prospects before the Spin-Off and throughout the Relevant Period.

45.     In particular, Defendant Nefkens, by virtue of his role as CEO and former position as CEO of Honeywell Homes, was acutely aware of the governance, products, supply chain, and other issues plaguing the Company since before the Spin-Off. Individual Defendants Nefkens and Ragan each repeatedly discussed in detail with investors the Company's earnings, its new products, its supply chains, and its issues related to the Spin-Off throughout the Relevant Period. Due to their positions in the Company, they had direct access to all of the data regarding the Company's

12

prospects and the problems facing the Company. As such, they clearly would have been aware that certain representations they made, as outlined herein, were false and misleading.

46.     It later became known that the Company's business and financial prospects were not at all close to figures that Individual Defendant told investors during the Relevant Period. The truth was only revealed to investors after completion of the Spin-Off on October 29, 2018. The financial projections Individual Defendants issued at the time of the Spin-Off which aggregated the projections of the random Honeywell business units that would become Resideo lacked a reasonable basis, in light of Resideo's lack of operating history and revenues as a single pre-spin business unit of Honeywell and the undisclosed problems that the Company had during the Relevant Period.

47.     The abrupt resignation of Individual Defendants Nefkens and Ragan after the Company's detrimental disclosures in late October 2019 and early November 2019 gives rise to an inference that the Individual Defendants had determined by that point that it was obvious to the public that the Company had issued false and misleading statements, necessitating a management restructure. The timing in which non-party, Robert Ryder ("Ryder"), the newly appointed Chief Financial Officer, revealed the truth,  after the Relevant Period, right after starting in his new position with the Company, shows likelihood that the Individual Defendants were aware of the Company's major problems but determined not to inform the investing public of these problems.

**The Individual Defendants' False and Misleading Statements**

48.     On August 23, 2018, before the Spin-Off, Honeywell published on its investor website a presentation entitled "Resideo At A Glance." The title page listed two authors of the document, Resideo and Honeywell Home. The second page was titled "Who We Are," with pictures of, among others, Individual Defendants Nefkens and Ragan, under the subtitle "Leadership," making it clear that the document reflected representations by Individual

Defendants.

49.     Among other things, the presentation touted Resideo's "Competitive Strengths" as follows:

> "Diversified revenue streams, strong segment profits and limited capital expenditures";
> "Agility and speed to market needed to move in a growing industry"; and
> "strong management operating system and attractive financial profile."

50.     Furthermore, Honeywell, under the heading "Company Snapshot", presented Resideo's role as a "Leading global provider of critical comfort and security solutions, primarily in residential environments" and a provider of "Innovative solutions protected by broad intellectual property portfolio."

51.     Individual Defendants touted that Resideo's Honeywell Homes division would provide "innovative, end-to-end solutions" that represented a "growing portfolio of connected home solutions" that was "one of the largest and most comprehensive in the market."

52.     The statements above were materially false or misleading and omitted material facts because in contrast to there being "strong segment profits" and an "attractive financial profile," this was not the case. Indeed, the Products and Solutions division was comprised of disparate businesses that had never operated independently with a separate operational or governance structures, such that it was false to state that the division as a whole, at the outset, had ever shown "strong profits" or to otherwise describe its "financial profile." The coming together of these disparate businesses in an efficient manner was far from complete, creating a significant hurdle toward attaining "strong profits" or an otherwise "attractive financial profile" in the immediate future. In addition, the unconnected thermostats that Resideo sold were outdated and from a prior generation, and the Company was having difficulty transitioning its customers to a new generation of its T-Series connected thermostats. One of the central reasons for that difficulty included, among

others, the fact that the connected thermostats Resideo sold were also outdated. In addition, most of the Company's connected thermostats were experiencing significant operational problems and the effort to integrate multiple thermostats at home with a remote control was late to market. There were also pre-existing, significant supply chain issues and a material decline in sourcing leverage caused by the Spin-Off. Exacerbating these difficulties, and making them more difficult to overcome, Resideo began with a depleted value engineering team necessary to maintain adequate profit margins. The efforts to synthesize Resideo's connected security products and, all of its products would take a lot longer than the Company told investors.

53.     The comments as to "agility and speed to market," were also false for the reasons stated above, given the constraints that Resideo would necessarily have due to its undisclosed product offering and product development problems and delays, its supply chain problems, its loss of sourcing leverage, and the problems that would likely eventuate from the agglomeration of disparate divisions that had not previously been run as independent businesses.

54.     The affirmation of "strong management operating system," was false, given the depletion of Resideo's value engineering team and the same issues alleged above concerning the joining together of disparate divisions that had never before had separate P&Ls as stand-alone business units, independent governance or operational structures.

55.     The representation that Resideo was a "Leading global provider of critical comfort and security solutions, primarily in residential environments," and a provider of "Innovative solutions protected by broad intellectual property portfolio," was misleading given Resideo's undisclosed product offering and product development problems and delays, at that time.

56.     On October 2, 2018, Resideo filed an amended Registration Statement on Form 10 in connection with the Spin-Off from Honeywell ("the Registration Statement"). The Registration

Statement attached a cover letter signed by Defendant Nefkens and included a description of Resideo's business operations, the reasons for the Spin-Off, and consolidated financials for the business segments that would become Resideo.

57.    The Registration Statement stated, in pertinent part:

We have a long-standing leadership position in the traditional/non-connected products space that contributes significantly to our net sales. Our growing portfolio of connected home solutions is one of the largest and most comprehensive in the market. Our connected solutions are supported by software platforms (which we expect to consolidate in a single platform and mobile application) that allow consumers and channel partners to easily install, use and maintain our solutions and third party devices. These platforms interact with other ecosystems to control SpinCo's and others' home automation devices.

ADI has long been an important channel to market for our security products, providing a level of end-customer intimacy that drives our ability to develop successful new products at an accelerated rate and insights into current market trends that help us quickly adapt our product portfolio to meet evolving customer needs.

We are strongly positioned to provide products that enhance consumers' comfort, convenience and sense of security and work together to contribute to a connected home ecosystem.

We have a long history of innovation and industry firsts in our Comfort & Care and Security & Safety markets and have a reputation for providing trusted, tested and proven products and solutions.

Our iconic Honeywell brand is globally recognized for quality, innovation, security and reliability.

Our comprehensive Products portfolio provides end-to-end solutions that focus on critical needs within the home, where product reliability and ease of use are of utmost importance . . . Our portfolio distinguishes us from our competitors, most of whom focus on niche solutions within the home. We provide solutions that address multiple consumer connected home needs under a common platform.

We are well positioned to leverage the growing demand for connected home solutions with our innovative products that are easy to purchase, install and deploy within the broader smart home ecosystem including our thermostats portfolio.

We believe we have an attractive financial profile highlighted by our diversified revenue streams, strong segment profits and limited capital expenditure needs. We have delivered strong net sales growth over the period from 2013 to 2017, during which our net sales grew at a CAGR of 3.7%.

We are developing new, innovative products and solutions across Comfort & Care and Security & Safety to grow our core business and differentiate ourselves from our competitors…..We plan to further expand our portfolio by bringing to market an extensive set of new solutions for everyday problems, including remote furnace and boiler monitoring, smart vents, shut-off valve solutions, battery- operated video motion cameras and a residential global intrusion system.

We believe we are well positioned to benefit from the growing demand for connected solutions in homes due to our breadth of offerings, customer reach and strong brand. As consumer preferences drive increasing demand for connected home solutions, we believe our portfolio of end-to-end solutions will become increasingly important. Compelling connected home use cases require careful orchestration of multiple solutions to create an ecosystem that can be reliably accessed by consumers on a common platform. A seamless experience is a key differentiator relative to single-purpose product providers.

58.     The representations above as to Resideo's "long-standing leadership position in the traditional/non-connected products space that contributes significantly to our net sales" were materially false or misleading and omitted material facts, because, given that its non-connected thermostats were outdated, the future market was in connected thermostats. Resideo's dominance in the area of non-connected thermostats was increasingly irrelevant and Resideo was unsuccessfully seeking non-connected customers to transition to it.

59.     Resideo's expectation of being able to "consolidate in a single platform and mobile application" all of its product offerings (a reference to Project STORM); its statement that it was able to "develop new products at an accelerated rate" and "quickly adapt our product portfolio to meet evolving customer needs"; its claims as to a "growing portfolio of connected home solutions," and that it was "strongly positioned to provide products that enhance consumers' comfort, convenience and sense of security and work together to contribute to a connected home ecosystem"; its boasts that it had a "long history of innovation and industry firsts in our Comfort & Care and Security & Safety markets," a "reputation for providing trusted, tested and proven products and solutions," "product reliability and ease of use," and "innovative products that are

17

easy to purchase, install and deploy within the broader smart home ecosystem including our thermostats portfolio"; its touting of its purported reputation for "quality, innovation, security and reliability," and "superior customer service"; its further statements that it was well-positioned to develop "new, innovative products and solutions across Comfort & Care and Security & Safety to grow our core business and differentiate ourselves from our competitors"; and the representation that Resideo was "well positioned to benefit from the growing demand for connected solutions in homes due to our breadth of offerings, customer reach and strong brand"; were all false or misleading and omitted material facts. Specifically, there were undisclosed, significant problems and issues limiting the competitiveness and operability of Resideo's product offerings. There were also significant customer complaints, and an inability to manufacture and roll out products under development on a timely basis, as well as significant supply chain problems.

60.    The representations as to "an attractive financial profile" were materially false or misleading, given the depletion of Resideo's value engineering team, and the issues likely to result from randomly putting together disparate divisions that had never before been run as independent businesses.

61.    The Registration Statement also contained a section "Risk Factors Relating to Our Business" concerning the Spin-Off:

> We have no operating history as an independent, publicly traded company, and our historical combined financial information is not necessarily representative of the results we would have achieved as an independent, publicly traded company and may not be a reliable indicator of our future results.

> We derived the historical combined financial information included in this Statement from Honeywell's consolidated financial statements, and this information does not necessarily reflect the results of operations and financial position we would have achieved as an independent, publicly traded company during the periods presented, or those that we will achieve in the future. This is primarily because of the following factors:

> Prior to the Spin-Off, we operated as part of Honeywell's broader corporate

18

organization, and Honeywell performed various corporate functions for us. Our historical combined financial information reflects allocations of corporate expenses from Honeywell for these and similar functions. These allocations may not reflect the costs we will incur for similar services in the future as an independent publicly traded company.

We will enter into transactions with Honeywell that did not exist prior to the Spin-Off, such as Honeywell's provision of transition and other services and brand licensing agreements, and undertake indemnification obligations, which will cause us to incur new costs. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell."

Our historical combined financial information does not reflect changes that we expect to experience in the future as a result of our separation from Honeywell, including changes in the financing, cash management, operations, cost structure and personnel needs of our business. As part of Honeywell, we enjoyed certain benefits from Honeywell's operating diversity, size, purchasing power, borrowing leverage and available capital for investments, and we may lose these benefits after the Spin-Off. As an independent entity, we may be unable to purchase goods, services and technologies, such as insurance and health care benefits and computer software licenses, or access capital markets on terms as favorable to us as those we obtained as part of Honeywell prior to the Spin- Off, and our business, financial condition, results of operations and cash flows may be adversely affected. In addition, our historical combined financial data do not include an allocation of interest expense comparable to the interest expense we will incur as a result of the Reorganization Transactions and the Spin-Off, including interest expense in connection with the incurrence of indebtedness at the Company.

We have no operating history as an independent, publicly traded company. Furthermore, while the individualized businesses or their predecessors have a history of product development going back over 100 years, we have neither operated with a residential Comfort & Care, Security & Safety, or home solutions business focus, nor combined that with a distribution business in the past, and we may not be successful in continuing to operate and grow our business with a narrower focus and outside the broader Honeywell operating environment.

We may face operational inefficiencies as we continue to integrate our business after the Spin-Off. Following the Spin- Off, we will also face additional costs and demands on management's time associated with being an independent, publicly traded company, including costs and demands related to corporate governance, investor and public relations and public reporting. In addition, while we have been profitable as part of Honeywell, we cannot assure you that our profits will continue at a similar level when we are an independent, publicly traded company. For additional information about our past financial performance and the basis of presentation of our Combined Financial Statements, see "Selected Historical and Unaudited Pro Forma Combined Financial Data," "Unaudited Pro Forma Combined Financial Statements," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our

historical Combined Financial Statements, and the Notes thereto, included elsewhere in this Statement.

62.    The alleged "Risk Factors" were materially false or misleading and omitted material facts because, while the Company disclosed it had not operated with a "Comfort & Care, Security & Safety, or home solutions business focus, nor combined that with a distribution business in the past," it omitted that the business units had in fact been individual pieces of distinct divisions within Honeywell that were thrown together by Honeywell and did not have prior separate P&Ls as stand-alone business units. Further, they suffered from undisclosed product, supply chain and governance issues, disclosed only later, by Ryder on December 11, 2019.

63.    Additionally, the statement that the Company had not operated with a "Comfort & Care" or "Security & Safety" business combined was materially false or misleading because it confused the fact that both of these business units were themselves creations of the Spin-Off and neither was an independent business unit within Honeywell.

64.    The statement that "As part of Honeywell, we enjoyed certain benefits . . . and we may lose these benefits after the Spin-Off" was materially false or misleading and omitted material facts because it was framed as a hypothetical, when, as noted herein, "it was pretty obvious" from the start that Resideo had suffered a loss of sourcing leverage that was significant enough to have adversely affected its gross margins. This factor was never disclosed by Individual Defendants during the Relevant Period when discussing margin issues and providing assurances that it would overcome issues leading to margin compression.

65.    The supposed "Risk Factors" were misleading and omitted material facts because they were entirely generic, could apply to any corporate spin-off, and disclosed none of the material product, supply chain and governance issues that had already occurred. These "factors", such as Honeywell's decision to combine business units with no prior relationship to form Resideo,

20

would have been known to Individual Defendants at that time.

66. On October 10, 2018, Resideo issued a press release, filed with the SEC on Form 8-K with the SEC, stating, "Our diversified revenue streams, strong segment profits and limited capital expenditure needs are just a few of the reasons Resideo has a bright future." This representation was materially false or misleading and omitted material facts for the same reasons stated above.

67. On the same day, the Company had its first Investor Showcase and Technology Demonstration. The slide presentation published in advance of the demonstration boasted, among other things, that Resideo's connected products provided "Seamless control across connected product categories" with "Software [that] Ties It All Together" and, as one reason why the Company was "Positioned to Drive Shareholder Value Well Into the Future," the Company had "Leading positions integrating and running most critical systems in a home."

68. These comments were materially false or misleading and omitted material facts in light of the undisclosed significant problems and issues limiting the competitiveness and operability of Resideo's product offerings, the significant customer complaints it was experiencing, and an inability to manufacture and roll out products under development on a timely basis, as well as significant supply chain problems it was experiencing.

69. The slides stated that in 2019, Resideo would yield over 4% of organic revenue growth, as well as an adjusted EBITDA margin of 13% pre-indemnity and post-indemnity 10% adjusted EBITDA margin.

70. During a conference call with analysts and investors held on October 11, 2018, only weeks before the completion of the Spin-Off, the Company's then-CEO, Defendant Nefkens, stated the following regarding Resideo:

We have great growth prospects, and we are the leader right now in connecting a lot of the stuff in the home that no one sees, like water heaters, boiler controls, leak detection, and we have the scale and capability to innovate and be a major player in this space.

71.    These comments were materially false or misleading and omitted material facts for at least all of the abovementioned reasons.

72.    Not long after its shares of common stock began trading, on November 8, 2018, Resideo issued a press release, which it also filed on Form 8-K, announcing that the Company's management would present at the Robert W. Baird Global Industrial Conference in Chicago, Illinois. In the November 2018 presentation attached to the same Form 8-K, Resideo touted that it had a "Mature, Integrated Supply Chain with Continued Application of Best-in-Class Honeywell Operating System":

As indicated above, Resideo went to great lengths to trumpet its supposedly robust and efficient supply chain, stating that the Honeywell Home Operating System (which became part of Resideo) supply chain was "strategically positioned in low cost regions that are located in or near key markets to reduce delivery time."

Resideo also touted the Company's line of "connected" (e.g., wireless) home products in the presentation. For example, Resideo stated it was "uniquely positioned to benefit from growing demand for connected homes," that it had an "Exciting and extensive new product line" and, under the "Key Growth Drivers" heading, that it had "Increasing penetration of connected systems." Resideo also claimed that it had "Seamless control across connected product categories." The presentation further touted Resideo's purportedly robust product development line, with "Continuous innovation and a shorter product-to-market period that, we believe, will drive revenue growth."

73.    The statements with respect to a "mature, integrated supply chain" and a "supply chain strategically positioned . . . to reduce delivery time" were materially false or misleading and omitted material facts for the reasons mentioned above and in light of the historic supply chain issues that existed prior to the spin-off and were only worsened due to the split in manufacturing facilities between Honeywell and Resideo.

74.    The statements in concerning Resideo's line of connected smart products were materially false or misleading and omitted material facts because, among other things: (i)

Resideo's connected products relied on obsolete technology that was late to market; and (ii) the technology that Resideo used in a number of its connected products material to its ability to generate revenue was subject to constant outages.

75.     The statements regarding "Continuous innovation and a shorter product-to-market period that, we believe, will drive revenue growth" were materially false or misleading and omitted material facts in light of the significant development and delivery delays Resideo faced with the T9 and T10 thermostats, the Project GRIP security panel, both for ADT and for direct consumers and the Project STORM product. Indeed, the representation as to a "Seamless control across connected product categories" seemed to refer the Project STORM product, which did not exist at the time, or any time within the Relevant Period, and was likely several years from production.

76.     On November 13, 2018, Resideo issued a press release announcing its third quarter 2018 financial results in which Nefkens was quoted as saying: "Our performance as part of Honeywell over the past three years demonstrates a well-run business that is on- track to deliver continued growth in 2018 and beyond." This exact same representation was made by Nefkens in the related earnings call on November 14, 2018. Additionally, Resideo reiterated that for full-year 2019, it was expecting "4 percent organic revenue growth [and an] adjusted EBITDA margin of 13 percent," a representation made by Defendant Ragan, Resideo's then-CFO, during his portion of the presentation during the earnings call.

77.     The comment as to "our performance as part of Honeywell over the past three years" was materially false or misleading and omitted material facts given that the Products and Solutions division was comprised of disparate business units within separate Honeywell divisions that had never operated independently with a separate P&L or operational or governance structures, as well as for all of the other reasons outlined above relating to the undisclosed

operational difficulties Resideo faces and its undisclosed product line and development woes. For the same reasons, Individual Defendants had no reasonable basis for its guidance of a 4 percent increase in sales and an adjusted EBITDA margin of 13% for the reasons outlined in herein.

78.     In the same press release, Resideo said, "Products segment performance was impacted by temporary supply chain issues as a result of the spinoff" but that the Company was "actively resolving" those issues.

79.     Similarly, during the related earnings call on November 14, 2018, Nefkens said that "with the spin behind us, operationally, our team is focused and back on track" and reiterated that the Company was "actively addressing [] supply-chain issues, and [] already seeing product flows moving back towards normal volumes." Further, Defendant Ragan referred to the "supply chain challenges" as "[s]hort-term."

80.     Nefkens was specifically asked about Resideo's supply chain issues on the earnings call by an analyst from Oppenheimer. The exchange went as follows:

> Oppenheimer Analyst: if you could give a breakout of how much of the growth was really impacted by spin related supply chain noise during the quarter, and then going forward what do you view as a normalized growth rate, and how quickly can you get there? Thanks.
>
> Nefkens: Thanks for the question. So – so yeah, so I'll talk a little bit about the spin related supply chain issues that we put out there because it did affect us in Q3 as expected. I talked about these at Investor Day. Typically what they are – are our items I will just give you a really good example like most of them are believe or not are administrative items. We had an example of customs related issues where paperwork comes in under the Honeywell name, Products needs to actually be come out the Resideo name, took a couple days to do that. We also have some plant shifts that we're making in Europe as a result of the spin. So, these are just items that we knew, were in front of us, we plan for it.
>
> In Q4 I can tell you right now we're already seeing volumes coming back to normal. And I've told the team and we're still looking out, there's still a few things we've got to make sure come through before we get clean. So I would tell you we're still seeing a few of those headwinds here in Q4 as expected. And we'll be fully back and running here by Q1. Again, the reason that we were able to – from our guidance at the top-end of the range is because we're already working through these items, and we're very

comfortable that we're on the other side of it now.

Oppenheimer Analyst: Okay, terrific. That's great. So, full power by the beginning of 2019?

Nefkens: That's correct.

81.     These comments were false or misleading and omitted material facts because the Products and Solutions' extensive supply chain problems existed before the spinoff and were not temporary but, rather, long-standing, and were far more serious than just administrative problems arising from the Spin-Off. Further, there was no evidence they were getting better at that time. In fact, they were becoming worse. In addition, the Spin-Off created additional issues that should have been disclosed if Individual Defendants were going to represent that the Company was "back on track." For example, the large loss of sourcing leverage, and the continuation of other pre-existing problems, such as the loss of Resideo's value engineering team, would predictably lead to depressed margins.

82.     On the same call, Nefkens compared Resideo to other similar companies, saying "they don't have product solutions or connectivity that sits behind the wall, which is really the core of any smart home. That's what makes us different."

83.     These comments were materially false because Resideo's "connected" app thermostat program was not designed to handle the number of users Resideo allowed on the system. As such, it was out of service every 3-4 days for periods of time as long as 24 hours. Its program to allow customers to control multiple thermostats at home with a remote control was developed later than anticipated. Therefore, other companies, such as Nest, had more advanced products than Resideo and dominated that market. Additionally, Resideo's connected security product for direct consumers, the GRIP, was "not close [to being] done," and the OEM product had been delayed in breach of the Companies contract with one of its largest clients, ADT.

Futhermore, Resideo's project to integrate all of its home-based platforms did not have the required technology for completion.

84.   During the presentation, Defendant Ragan said, "Our business is performing well. And we expect the powerful combination of scale, steady growth and market position will give us margin expansion and significant equity valuation uplift going forward."

85.   This representation was misleading and omitted material facts in light of the depletion of Resideo's value engineers, which predictably negatively impacted margin growth, significant supply chain issues, loss of sourcing leverage, and product problems and delays Resideo was experiencing.

86.   Defendant Ragan presented and made public statements at the Imperial Capital Security Investor Conference in New York on December 12, 2018. Defendant Ragan tried to paint the picture that Company's supply chain was only historical and compared them to issues that existed ten years prior. He said, "We have done a significant amount of work on the factory rationalization. 10 years ago, there were 50 factories and somehow Michael got from 50 to 18 and doubled revenue, which is spectacular . . . the company is incredibly efficient from a manufacturing supply chain perspective."

87.   This statement was materially false and misleading because: (1) ten years in the past, Resideo did not exist. Some of the disparate businesses that comprise the Company were present at the time, but those that make up the Products and Solutions division were not run as independent businesses; and (2) the random combination of business groups into a new entity created new undisclosed issues of overcapacity and inefficiency. As later revealed after the end of the Relevant Period by Ryder: "We probably have too many [products], we might be in too many places. Maybe our manufacturing facilities aren't in the right places with the right freight lanes.

Maybe capacity utilization isn't where we would want to be."

88.     Individual Defendants' favorable depictions of Resideo's supply chain and other Spin-Off-related issues made the Company look more favorable to analysts and the investing public.

89.     On November 13, 2018, an analyst, Oppenheimer, issued a report in which it maintained an OUTPERFORM rating, noting that while it experienced "typical spin-off related supply chain headwinds," "Management expects these temporary headwinds to subside quickly and for the business to normalize in 4Q18."

90.     On March 7, 2019, Resideo issued a press release in which it reported its fourth quarter and full year 2018 results. In this release, Defendant Nefkens touted Resideo's "strong performance for the fourth quarter and full year, despite the spin-related cost based coming in higher than expected." However, while he also boasted that "we successfully executed the spin and met or exceeded financial expectations," the press release also reported, under the "Segment Performance" section, that "[Products and Solutions] segment profit decreased 20 percent, impacted by one-time spin-related costs." It also reduced Resideo's 2019 revenue guidance from 4 percent to an indeterminate range of "2 to 5 percent."

91.     Defendant Nefkens, also said "The disruption from the spin is mostly behind us." During the earnings call on the same day, Defendant Nefkens made similar statements. Defendant Nefkens repeated this message during the call saying that this was the third Spin-Off that he had been a part of and "we're on schedule, and in some cases, ahead of schedule, when I compare to previous spins I've been [a] part of," and "I also feel really good that most of the disruption from the spin is now behind us." In response to a question from an analyst question about the lowered revenue guidance, Defendant Nefkens said:

As you guys know with the spin this effectively is the first time that we are having all of our costs under our control . . . [W]e're at a strategic inflection point. I would tell you that we are at or ahead of where I expect[ed] to be.

92.     These assurances were false or materially misleading because they did not disclose the mostly pre-existing, persistent and worsening supply chain issues Resideo faced. The representations were also materially false or misleading because of Defendant Nefkens' claims that "most of the disruption from the spin is now behind us" and references to a "strategic inflection point," indicated that Resideo was "at or ahead of where I expect[ed] to be". These statements covered up a long list of material undisclosed problems, including challenges presented by Resideo's competition to the T-Series thermostats, the disappearance of major channel partners and security partners, the issue of Resideo's "Cloud," customer churn in the security department, and the lack of clear plan to produce more products.

93.     Despite a lowered guidance, the press release promised "an initiative to optimize our cost base" as one means of increasing margins. Similarly, Defendant Nefkens, connected Resideo's disappointing results to spin-related disruptions that were historical and stated during the earnings call that, "[w]hile our spin-related cost base came in higher than expected and put some downward pressure on our near-term EBITDA, we're already taking action to optimize the cost base and operating footprint we inherited from the spin." Defandant Nefkens said these actions and "new product launches," would "get us back to where we want to be margin-wise in 2020." Defendant Ragan similarly assured that the "margin uplift for next year when you add in the incremental EBITDA that we'll get from the cost takeouts as well as having gotten through that initial investment is 150 to 200 basis points." Defendant Ragan said "With respect to EBITDA margins, we're expecting approximately 11%, excluding the Honeywell reimbursement agreement payment, and 8% including"

94.     Individual Defendants' statements as to what steps the Company intended to take to increase margins compelled them to fully disclose the many problems that were actually responsible for these lowered margins which could reasonably be expected to lower any chance of success that those efforts may have. These included the loss of Resideo's value engineering staff, significant loss of sourcing leverage, continued longstanding supply chain issues, and inefficiencies relating to the number of products the Company was manufacturing and selling, the placement of manufacturing facilities, and capacity underutilization. These significant obstacles were misleadingly omitted by Individual Defendants.

95.     Similar to these statements that the Company would experience margin increases due to "new product launches," Individual Defendants also touted Resideo's new product pipeline, including the alleged industry-leading T9 and T10 line of smart thermostats: "In addition to successfully completing the spin we also launched some terrific products in the fourth quarter, including our market-moving next-generation security platform, universal heat pump defrost controls and the T9 and T10 thermostats." Afterward, Defendant Nefkens stated: "our innovative product pipeline and focus on doubling our high-margin recurring revenue stream will further solidify our existing market leadership." In fact, Resideo's products were outdated and significantly late to the market.

96.     In the same press release, Individual Defendants said, "Over the year ahead, Resideo will roll out next generation platforms in both its security and comfort division. In security, Resideo's Global Residential Intrusion Platform is extensible and brings enhanced software offerings. In comfort, Resideo is launching a pioneering platform with recurring services that integrate all dimensions of home wellness." The press release also said, "The company began customer deliveries of its next-generation security platform (Global Residential Intrusion

Platform/GRIP) in December 2018." Defendant Nefkens also represented during the earnings call that Resideo would speed up product launch originally scheduled for 2020 into 2019, and would make its Comfort products available on a "single app."

97.     In regard to the GRIP product, an analyst questioned "parsing out" the 2-5% top line guidance pursuant to product mix between Products & Solutions and the ADI Global Distribution arm, as well as expectations as to new product introductions. Defendant Nefkens responded as to the purported roll out of the product to it largest OEM customer, ADT, and its plans to roll out the version that was being developed for direct customers:

> The big item for us this year is going to be our security business. We have the rollout of our new Global Intrusion Platform, started in December. That rollout is progressing very, very well with our first customers. And for us to be at the top of the range, we're going to need very strong performance from our teams in second half of the year in the – in GRIP.
>
> *       *       *
>
> Our biggest investment is … – the rollout of our GRIP platform, that's the next-generation security platform, which is already rolling out [] we've got our largest customer that comes up first, then we have general market in the Americas and then we move to general market in Europe. We were not planning a European launch until 2020. We're accelerating that into 2019 as well. So we've got investment increases to make that happen.

98.     These comments were materially false or misleading because: (1) the GRIP product for the direct consumer market was not nearly "ready" and was slowed by a "poorly scoped" and inefficient development process that made acceleration of the rollout of the product into 2019 unachievable, and (2) the separate GRIP product for ADT had been delayed past the point at which Resideo had confirmed to ADT it would be ready, resulting in millions of dollars in lost revenue and contractual penalties.

99.     The Individual Defendants themselves later contradicted this assertion and never again said a launch date in December 2018 would be achievable for GRIP. In the May earnings

call, Defendant Nefkens stated, "Volume shipments began for our largest customer in February," which was inaccurate. In a June presentation that Defendant Ragan made to investors at the Robert W. Baird Global Consumer, Technology & Services Conference, he said of GRIP, "we rolled out and started to deliver this year."

100.    As to the Comfort division, Defendant Nefkens, in further response to the same analyst's questions, stated, "we're pulling forward our platform - new platform launch in our comfort business from 2020 to 2019. If we can get some of that into the fourth quarter, then I would be very optimistic about where we can be from a growth perspective in our products business as well." He also said:

> On the comfort side, as I said earlier, we've rolled out several great products, the T9 and the T10 that Ian mentioned earlier. But we are going to have a new platform launch that was planned for 2020. We're accelerating that into 2019. All this is done to do two things. Number one, it's to accelerate our growth, and number two, it's going to be the [both] platforms that are necessary for us to really push subscription services. Our older products did not have the capability to do that. They were multiple applications. This will all be under single app, and we'll be able to launch our first generation of subscription services, which will drive our recurring revenue north. So that is why we're accelerating these investments. Those investments are primarily in the product segment, and we'll also be executing, as I mentioned in my prepared remarks, a few tuck-in acquisitions as well to give us other IP and products that will help us bring those subscription services to market.

101.    The above representations were materially false or misleading because the T9 and T10 were late to the market and reflected technology no more advanced than products that were already available to consumers. Additionally, Resideo's moves to introduce new products were adversely affected by the lack of engineering professionals coming to Resideo from Honeywell, an admission later acknowledged by the Individual Defendants.

102.    Defendant Nefkens said, "We have heard very clearly from our customers that they are excited about Resideo, they love our products, but they want us to move faster." This representation was false because by the end of the Relevant Period, the Company disclosed that

Resideo had a difficult time transitioning customers to its new generation of T-Series thermostats. The previous customer channels had been declining in sales for years, partly due to outdated technology. Thus, customers were less than happy with the products being offered at that time. The Company faced severe challenges presented by Resideo's competition to the T-series thermostats; TCC thermostats, which comprised 85% of the connected thermostats the Company sold; severe outages; the loss of major channel partners; loss of security partners; the challenges of Resideo's "Cloud"; and customer losses on the security side of the business.

103.    On March 12, 2019, Resideo's management, including Defendant Ragan, presented at a meeting hosted by Bank of America Merrill Lynch ("BOM"). The next day, BOM issued a report which described Resideo as a "BUY" and said, "Following yesterday's meetings, we have greater confidence in REZI's ability to achieve, and most likely surpass , its revised 2019 adjusted EBITDA outlook of $410-$430mm, which was reduced in the context of last week's 4Q18 earnings results."

104.    On March 18, 2019, Resideo filed with the SEC its Annual Report on Form 10-K ("Form 10-K"), signed by Defendants Nefkens and Ragan. In the Form 10-K, the Individual Defendants repeated many of the same material misrepresentations as to Resideo's organizational efficiency, financial performance, product line and purported innovation.

105.    Individual Defendants stated in the Form 10-K that, "Our extensive product portfolio also enables us to achieve profitable economies of scale in production, distribution and speed to market while making us a 'go to' partner in the smart home ecosystem." Similarly, Individual Defendants made the following representation:

> Our financial performance is underpinned by our implementation of the Operating System ("OS"). OS is integral to our organization, and was founded on the lean and six sigma principles of continuous improvement in quality, delivery, cost, growth and innovation. We have continued to execute the OS model following the Spin-

Off, resulting in improved manufacturing productivity, more rapid product innovation and increased cost efficiencies. Important parts of our supply chain are strategically positioned in low cost regions located in or near key markets, consistent with a strategy of optimizing our supply chain and reducing delivery times. We have extended OS concepts beyond lean manufacturing to our Global Distribution business, customer service and product development areas. We are applying these practices to develop global platforms to drive standardization for scale and cost efficiency, while incorporating key technologies and functionalities to drive speed and faster innovation for our contractor partners and end-user customers.

106.    These comments were misleading and omitted material facts, because, as later revealed, Resideo was tarnished by "a lack of pre-existing standalone business," due to Honeywell's reorganization of Resideo that "kind of picked individual pieces up and kind of threw them together." The Company later acknowledged that "[w]e probably have too many [products], we might be in too many places, maybe our manufacturing facilities aren't in the right places with the right freight lines, maybe capacity utilization isn't where we would want to be." Further, Resideo's value engineering team had been depleted and Resideo suffered from fundamental supply chain problems.

107.    As to the marketability of its products and Resideo's purported new products that would increase demand for its brand, Individual Defendants touted, "We are well positioned to leverage the growing demand for connected home solutions with our innovative products that are easy to purchase, install and deploy within the broader smart home ecosystem including our thermostats portfolio." They continued:

Our innovation is supported by the Resideo User Experience design group, which creates value by understanding and translating the needs of consumers and channel partners to develop intuitive, desirable and brand differentiated end-to-end experiences;…We have over 1,300 engineers creating innovative solutions in software centers of excellence located in Austin, Texas, Bengaluru and Madurai, India and other locations;… We are developing new, innovative products and solutions across Comfort, RTS and Security to grow our core business and differentiate ourselves from our competitors;…Our award-winning thermostats are our most iconic products and we market certain models directly to end consumers.

108.    These representations were materially false or misleading and omitted material

facts because: (1) Resideo's TCC thermostats, which accounted for about 85% of the Company's connected thermostats, were subject to chronic severe service outages on a periodic basis, problems that "resulted in direct impact to the customers of the company"; (2) Resideo was 18 months late to the market with its newest thermostats, the T-9 and T-10, which allowed customers to control multiple home thermostats remotely, because Resideo did not have the required professionals– including software developers and product engineers – to produce it in time and its competitors beat Resideo to the market; (3) Resideo's line of security products inherited from Honeywell was outdated when compared to others in the market such as Nest and Alarm.com; (4) Resideo did not have enough talented engineers to produce new products before their competitors' products hit the market because Honeywell maintained the best engineers during the Spin-Off; and (5) Resideo's new CFO at the end of the Relevant Period stated as to its products, new and old, that they were "not completely launched, right, but weren't really accepted by customers, weren't really competitive," and "[w]e had the inventory. And unfortunately, nobody wanted to buy it, which is why we had these inventory write-offs, okay"?

109.    As in the Registration Statement, Individual Defendants repeated the representation that "Our attractive financial profile includes diversified revenue streams, strong segment profits and limited capital expenditure needs". For the above reasons, these statements did not reflect the true position.

110.    Resideo boasted about its relationships with OEMS, stating:

> We also have long-standing relationships with important OEMs and service providers such as ADT Security Services, United Technologies and A.O. Smith Corporation. A number of these relationships extend more than 25 years, including some spanning over 40 years. These deep partnerships are possible because OEMs value our design capabilities, innovation, domain expertise, supply chain capabilities and product quality, and our commitment to working with them to grow their businesses by way of the Resideo/Honeywell Home platform and suite of products.

111.    These statements omitted mention of Resideo's GRIP project for ADT, the

Company's single-largest customer, was subject to extensive delays that caused friction in the Company's relationship with ADT. Specifically, Resideo had lost major channel partners, including its second largest up to that time, Ackerman Security.

112.    The "Risk Factors" listed in the Form 10-K repeated the same ones included in the Registration Statement and were materially false or misleading and omitted material facts for the same reasons.

113.    On May 8, 2019, Resideo issued a press release announcing its first quarter 2019 results. In the release, the Company stated, "[w]ith continued confidence in our ability to execute and positive first-quarter results, we are reiterating our full-year 2019 guidance to reflect revenue growth of 2-5% and Adjusted EBITDA at the upper end of the range of $410 to $430 million." Similarly, in a related earnings call that took place on May 9, 2019, Defendant Ragan stated, "[w]e've reiterated our guidance for growth in a range of 2% to 5% as we gather more visibility into 2019. As I mentioned, we are guiding to the upper end of the adjusted EBITDA range of $410 million to $430 million." Defendant Nefkens emphasized the point, saying, "for 2019, we're confident in our growth guidance in the upper end of our EBITDA guidance, and we remain optimistic."

114.    These representations were misleading because they omitted mention of Resideo's product problems and delays, resulting in loss of business and sources of margin pressure, including a depleted value engineering team and loss of sourcing leverage, significant risks of lost earnings because of a contract provision providing for large penalties with a large customer, and the difficulties, inefficiencies and uncertainty resulting from the joining of separate and dysfunctional business groups.

115.    In the press release, Defendant Nefkens said, "We're off to a great start in 2019

with strong Q1 revenue performance in both our Global Distribution and Products & Solutions businesses. In Q1, our in-house innovation shined with the launch and strong sales volumes of our next generation pro security platform." The press release further said that "Resideo's new next-generation pro series security platform began rollout in Q1 (notwithstanding the Company's prior representation of a December 2018 rollout). This revolutionary platform delivers both entry-level security protection and scales to a fully integrated smart home security solution. It features new self-contained wireless panels, advanced encrypted sensing, and offers dealers one system for easy installation and support." The description was about Project GRIP, although that name was not used. In the earnings call discussion, Defendant Nefkens, answering a question from an analyst, affirmed "the differential in margin profile when you guys are selling through to an OEM-type customer relative to, if you're just selling kind of directly to a contractor through a higher-touch distribution model that might come with more margin." The product referred to was the one manufactured for ADT, which had a lower margin than if the Company was selling such a product directly to consumers: "[W]ith the launch of our security platform to right now, which we're basically rolling out to one of our largest customers. That is an OEM-type contract, it has lower price points."

116.    The above statements omitted material facts because they failed to disclose that the separate GRIP product for ADT had been delayed past the point on which Resideo had confirmed to ADT it would be ready. The delay resulted in millions of dollars in lost revenue and significant contract penalties.

117.    One of the factors Defendant Nefkens attributed to causing the negative financial results was "[c]ontractual customer rebates associated with" a contract renewal in 2017 with "a large OEM security customer." The "customer" he referred to, was ADT.

36

118.     Further, Defendant Nefkens affirmed that while the separate, higher margin Project GRIP project was not yet ready for shipment, it would be ready by the end of the year. It would be able to integrate with all of the Comfort products, a process that was internally referred to as Project STORM. First, as to Project GRIP, continuing his answer to the analyst question alleged above, Defendant Nefkens initially said, "[s]o we're basically rolling that product out first at the lowest price points while we still have not come up the scale from a manufacturing perspective, and that's causing kind of the product mix here. So that's how you – we're looking at the product mix bucket. And as we continue to go faster, that's [when] we've increased the number there."

119.     Further, as to the time frame for rolling out first the consumer version of the Project GRIP product and thereafter the Project STORM product, Defendant Nefkens made the following comments to an analyst:

> Jeffrey Ted Kessler: This is Jeff Kessler at Imperial Capital. Can you talk a little bit about – beyond your largest customer on the security side when you're talking about putting together both a home product selection on the security side as well as integrating heat and cold equipment. When you look at the next level down of companies or let's just call it both direct dealers as well as channel partners, what are you finding as the sweet spot for what they want so that you can maximize – to some extent, maximize your scale and margin, maximize what they want at their end to satisfy their end users the most? Where are you finding that compromise, that mix that would be maybe the sweet spot for growth in this company beyond the relationship with your largest buyer?

> Nefkens:Yes, Jeff. So thanks for the question. So obviously, we're really excited about the launch of our pro [series] security product, and this product is redefining the industry with its self- contained wireless panel, its encryption, its sensing capability. I mean this is a true classic example of non-creepy [surveillance]. So we are not listening to the customer, we're not taking video. It's a true sensing product, and it's wireless, and very easy to use. For the end user and very easy to install for the dealer and it's got user-replaceable modules. So they don't have to do a truckload to get that out there, which is going to save the dealer quite a bit of money going forward as technology [needs an] upgrade.

> [Y]our question around the sweet spot for us, as we roll this out to the rest of our customers, being able to integrate not only the hardware but the hardware with our software, is going to be key for us, and then being able to leverage our platform to

move into other adjacencies like the Buoy example [a home water flow product] that was just given. So we'll have the capability by the end of the year, beginning of next year. If you are using our application for security products, you're also going to be able to integrate the Buoy product and see what's happening with the water in your home, and we're going to be able to move into air quality as well. So that's why we're so excited about these platforms. That's why we're accelerating these platforms is because they give us more opportunity to grow our recurring revenue as we go forward.

120.    Defendant Nefkens's comments were materially false because the Project GRIP product for consumers was "poorly scoped" and "not close to done" as of the time of this statement. There were no set timeframes and no clarity as to what the finished product would look like. Project STORM, which Defendant Nefkens alluded to as "being able to leverage our platform to move into other adjacencies," did not have nearly enough of the required technology to reach the its completion and end dates which were picked arbitrarily without consideration of whether they were possible.

121.    The press release further stated:

At the Consumer Electronics Show in January, Resideo announced its Honeywell Home™ T-Series Smart Thermostats – the T9 and T10 Pro – which feature wireless smart room sensors. Resideo offerings won multiple awards at CES, including a Consumer Technology Association award, and earned mentions in multiple "top pick" and "best of CES" coverage.

122.    Also, during the related earnings call, Defendant Nefkens said that "we celebrated the award-winning launch of multiple products at CES [Consumer Electronics Show], including our T9 and T10 smart home thermostats."

123.    In the First Quarter 2019 investor presentation published to Resideo's website the next day, the Company touted "[s]trong growth in security driven by launch of next generation platform" and the "[a]ward-winning launch at CES of new smart thermostat (T9/T10)." The presentation also highlighted supposed "[i]mprovement in supply chain execution."

124.    The presentation contained a chart describing Resideo's key competitors in select

business units and whether Resideo had a larger addressable market and market growth estimate than its competitors. Regarding the Connected Thermostats subdivision, Defendant Nefkens stated:

> Moving up the chart to our largest business of Products & Solutions, Comfort. We have broken the down into 4 subsegments: the first, connected thermostats, is a growing market at 10% plus, and we've been performing above market with multiple market-gaining launches over the past 12 months, including the T9 and T10 smart home thermostats.

125. Similarly, in another part of the presentation, Defendant Nefkens had the following exchange with an analyst describing the T9 and T10 thermostats and what he referred to as the "superconnected" thermostat:

> Ian Alton Zaffino - Oppenheimer & Co. Inc: Okay. And then you had a very successful launch of the T9 and T10 at CES. Now is that the superconnected thermostat or is this what's coming before and then you're going to have the superconnected coming afterwards? And what's kind of the timing of that rollout?

> Nefkens: Yes. Ian, it's Mike here. So the T9 and T10 are top-of-the-line connected products that have been in the works really for the last year. So – as you mentioned, we launched those very successfully at CES here in January. The T9 is the kind of the do-it-yourself model, and the T10 is the pro model. So the thermostat we've been alluding to we'll be launching towards the second half of this year, and that will – that is the superconnected one that's in the works right now and we expect to be shipping those next year at the first of 2020.

126. These comments were misleading because they failed to disclose that the T-Series thermostats had been declining for years and had been considered outdated before the Spin-Off from Honeywell. Individual Defendants themselves admitted at the end of the Relevant Period that a poor pre-spin transition from the prior generation of non-connected thermostats in 2017 to the new T-Series line impacted the adoption by the market of mid- level T-Series thermostats.

127. As to the TCC connected applications, which comprised approximately 85% of Company's connected thermostats, the infrastructure for the product was not designed to handle the 3 million users that Resideo allowed on the system. Nevertheless, Resideo still sold the product even after the Company knew of this problem. As a result, the engineering team responsible for

the project warned of a possible crash that could occur as early as the summer of 2018. Indeed, their warnings were not unfounded as a crash occurred in November 2018. As a result of this problem, the TCC app was out of service approximately every 3-4 days for as long as 24 hours resulting in numerous customer complaints.

128.    The representations with respect to the T9 and T10 thermostats were materially false because the rollout of those thermostats was delayed by about 18 months and Resideo's competition, which included Google's Nest product highlighted by Resideo as a key competitor, had already surpassed Resideo's technology and captured that market. The representation as to a "superconnected" thermostat was misleading because Resideo had a lack of technical talent, including software developers and product engineers, which significantly delayed the time in which it could launch any new products.

129.    As to the Traditional Temperature Control Segment (i.e., non-connected thermostats), Defendant Nefkens said, "next, is traditional temperature control, which includes nonconnected thermostats, hydronic heating controls, zoning controls, et cetera. That's a $2.5 billion market where Resideo is the clear leader, but the market traditional temperature control is flat, and we're performing just about that." This comment was false because, as the Company later admitted, its products in this area were outdated, from a prior generation, and it was striving, unsuccessfully, to move consumers to another product. As the connected thermostat market was growing with more modern technology being deployed as new homes were continuously built, the non-connected thermostat market was shrinking. As such, Resideo's and Honeywell's market dominance with non-connected thermostats continued to become less relevant.

130.    Defendant Nefkens then described the RTS business that "includes the behind-the-wall controls, for hot water heaters, boilers, furnaces, et cetera." Defendant Nefkens stated that "in

RTS, Resideo has a strong and leading market position and growing well above market." These statements were misleading because they failed to disclose the "huge impact on margins" for the EMEA division of the RTS business. This caused the Company to pay for devices that normally cost between around 80 cents to $2.50 per unit , $9.00 to $15 per unit. As the Company later disclosed, before adoption of an upcoming regulation affecting RTS products, Resideo did not sell, and distribution channels were sufficiently aware of its likely implementation such that they were stocking up on dated products. If those channels knew this, then Resideo, a participant in the RTS business, surely knew of it as well, including that existing non-compliant products would be taken over. Therefore, there was a material risk that those channels would stock up with such products, crowding out Resideo's products.

131.    In summary, Individual Defendants used the chart referenced in ¶ 124 above to claim that Resideo's products – including Connected Thermostats, Traditional Temperature Control and the RTS business – were purportedly "above market" competitors, including Google Nest. In this regard, Defendant Nefkens said: "So to summarize, Resideo has market-leading positions [in] performance in the markets we serve, coupled with solid Q1 improvements in our Pro Security business. So our work is to gear [Resideo] to accelerate growth even further in these markets." For all the reasons stated above, this statement was materially false or misleading and omitted material facts.

132.    Also during the call, Defendant Nefkens again claimed that Resideo largely put its spin-related issues behind it, stating, "The product segment also saw tangible improvement in supply chain execution as we work through spin-related headwinds from the past 2 quarters" and "We're also starting to move beyond some of the supply chain and cost spin burdens." These statements were misleading because most of the supply chain issues had pre-dated the spin,

required significant changes in infrastructure to be fixed, and had not been resolved at that time. After the end of the Relevant Period, Ryder said, "maybe our manufacturing facilities aren't in the right places with the right freight lines."

133.    In response to an analyst who asked, "what type of margin expansion should we be expecting," Defendant Ragan responded, "from the new products, we'll get additional scale throughout the whole year, we've got it at 8%, which is what we did in Q1."

134.    This comment was misleading because it omitted material facts relating to sources of margin pressure, including a depleted value engineering team and loss of sourcing leverage, significant risks of lost earnings because of a contract provision providing for huge penalties with a large customer, likely ADT resulting from Resideo's late delivery of its GRIP product, and the problems arising from adjoining of separate and dysfunctional business units.

135.    Defendant Ragan's statement was also misleading and omitted material facts because it did not disclose the extent to which the margin expansion would result from "the new products." There were significant problems with each of Resideo's new products and significant delays in the introduction of others, aside from what Individual Defendants were disclosing.

136.    After the press release and earnings call, analyst Oppenheimer issued a report on May 8, 2019 maintaining its OUTPERFORM rating, emphasizing Resideo's affirmation of its 2019 guidance and intended cost cutting initiative to increase margins. On May 16, 2019, BOM issued a report in which it maintained its BUY rating, focused on Resideo's "plans to launch a new comfort platform later this year to help accelerate growth in its product business, led by its new 'super-connected' thermostat."

137.    On June 6, 2019, Defendant Ragan presented at the Robert W. Baird Global Consumer, Technology & Services Conference. During the presentation, Defendant Nefkens

discussed the Company's GRIP product and the contract with ADT, stating in pertinent part:

> We talked about the strong growth in Security. We won a large contract with ADT. And as we roll that out, we don't have the leverage yet on that particular product. That's our GRIP, Global Residential Intrusion Platform, that we rolled out and started to deliver this year. As we go through the year, we'll get margin expansion as we get additional volume and scale there.
>
> * * *
>
> And the next-generation security platform is going great as far as the adoption. I'm sure everyone's seen the ADT commercials. That is our platform that they're highlighting there, and it is a great product.

138.    These comments omitted material facts, namely that Resideo had delayed the launch of the GRIP platform and the delay in the rollout damaged its client relationship with ADT, causing millions of dollars of lost revenue and contract penalties.

139.    During the presentation, Defendant Ragan further stated that Resideo "got a lot of traction in connected thermostats . . . So we have made a move in connected thermostats. We were behind. We were #3 behind Ecobee and Nest, Now we're #2. So we are getting some momentum there. We rolled out a new connected thermostat, T9, T10, at CES, and that's gotten great adoption. That's clearly the best product in the market today which is driving some of that share growth that we have", going further to state that "T9, T10 functionality is actually the best in the market."

140.    These statements failed to disclose that Resideo rolled out its connected thermostat products late and Nest had captured the market in that product area.

141.    With respect to "the traditional temperature control, that is the nonconnected thermostats," Defendant Ragan stated that while "the market overall is flat," Resideo "continue[s] to take share there" and it has a "compelling position in the non-connected space, much greater than 50%."

142.    This was false, because, by the Company's own subsequent admission, its products in this area were outdated, from a prior generation, and it was trying, unsuccessfully, to move

consumers to another product. Further, Resideo's position in the non-connected thermostat market was increasingly irrelevant as that market was moving toward more modern technology.

143.    Regarding the decline in the RTS business, Defendant Ragan stated "comps year-over-year were tough" and "so the comps don't look as good as we would like" but assured investors that "that's really just a temporary issue."

144.    This statement was false because this was not a "temporary issue". Rather, there was significant ongoing pressure on RTS margins in Resideo's EMEA division RTS business.

145.    On June 6, 2019, Whitesand Research issued an analyst report on Resideo and stated in pertinent part:

> We believe that the guidance cut (during 4Q18) is behind and REZI has laid out a path to accelerated growth following its 1Q19 earnings. The margins are also anticipated to rebound over the medium term. REZI trades at ~7.3x our FY 2020 adjusted EBITDA estimate, which is at the lower end of the peer group despite better margins and growth outlook. In our view, REZI is undervalued at current levels.

146.    The report continued: "The next generation security platform launched in late 2018 saw solid growth in 1Q19 as shipments began to one large customer. REZI expects the product to reach the entire customer base by 1H20 which should further drive revenue."

147.    On August 7, 2019, Resideo issued a press release announcing its Second Quarter 2019 financial results, disclosing a GAAP net loss of $11 million and GAAP EPS loss of $0.09. The press release also disclosed that Products & Solutions EBITDA had decreased 36% as a result of "unfavorable product mix, production cost increases, and the impact of acquisition expenses."

148.    After disclosing segment-specific EBITDA declines, Resideo reaffirmed its guidance of full year revenue growth of 2-5% and at the upper end of the Adjusted EBITDA range of $410 - $430 million, supported by the Company's cost reduction program, which was on track to yield $50 million in annualized savings by 2020 according to Resideo.

149.    Additionally, Defendant Nefkens said that Resideo's "momentum continues with

strong top-line growth during the second quarter, spread evenly across our ADI Global Distribution and Products and Solutions businesses." At the conference call held the next day to discuss the results, Defendant Ragan also reiterated the prior 2019 guidance.

150.    These statements were misleading because they did not disclose the fact that the integration of these disparate businesses in an efficient manner was not complete; there were undisclosed significant problems and issues which tarnished the competitiveness and operability of Resideo's product offerings; there were significant customer complaints at that time; and there was an inability to manufacture and roll out products under development on a timely basis, resulting in part in lost revenue and contract penalties, as well as significant supply chain problems.

151.    On the same conference call, Defendant Nefkens yet again said this time Resideo overcame its spin-related problems, and said, "We are finally starting to see some normalcy after all the spin work." He further stated: "As you may know, we had some supply chain headwinds pre- and post-spin. But due to new supply chain leadership and process changes, we're delivering more on time than ever before and our delivery metrics are the best they've been in 5 years. This improvement will allow us to be more aggressive on the growth side."

152.    Defendant Nefkens then said, "I also want to call out the incredible strides we've made on improving our supply chain."

153.    These statements were misleading because they failed to disclose that fundamental supply chain problems, requiring significant changes in infrastructure needed to be fixed, had still not been resolved at that time. As Ryder said, after the Relevant Period, "maybe our manufacturing facilities aren't in the right places with the right freight lines."

154.    On the issue of the Company's profits, Defendant Ragan said "We are more than confident we will mitigate any weakness with cost reductions." In response to a later question

concerning the cost reduction program, Defendant Ragan answered, "we are driving across the cost and the company overheads as well as looking at gross margin improvements as well and supply chain. So there are multiple opportunities that we're working currently. So I would expect continued SG&A improvement as we take costs out of that structure, and you should see some improvement on the gross margin line as well."

155.    These statements were false or misleading because they did not disclose the depleted value engineering team and loss of sourcing leverage as to material sources of margin pressure, a contract provision providing for large penalties with a large customer, likely ADT, in connection with the late delivery of the ADT product, and the difficulties, inefficiencies and uncertainty resulting from bringing separate, and in-cohesive business units together.

156.    During the call, Defendant Nefkens was also asked about how the Company would innovate in the fourth quarter to bring new products that would be better than its competition:

> This is Jeff Kessler at Imperial Capital. With regard to non- ADT business in the Pro market, what are the medium and some of the smaller – but maybe let's shift into the medium regional companies asking for – as you begin to change your product line and advance it in the fourth quarter, what are they asking for that is different or additive to what they have now to keep them – to keep their value proposition up and higher than, you might call, the new competition?

> Nefkens: Thanks, Jeff. This is Mike here. I'll answer that. So yes, so looking at security, we will be rolling out our new Pro series platform to the general market in Q4. So that in 2020, we'll be rolling that out in Europe. So we have launched it with our largest customer, and we will be rolling it out to general market in Q4 and then into Europe next year.

157.    These comments with respect to the Project GRIP security product were false because there were no set milestones for teams working on the project to meet, no idea what the finished product was supposed to look like, and no improvement upon the process that would make a launch date in 2019 possible. Further, the Company suffered a lack of talented engineers needed to successfully complete this product launch and it worsened that problem by engaging in a

46

significant reduction in workforce by a series of layoffs as part of the cost-cutting program designed to, in other ways, expand margins.

158.    On August 12, 2019, Oppenheimer issued a report in which it expressed concern about the Company's margin profile "over the next 2-3 years," revealing that "management also acknowledged there is a 'new normal' in security and margins should settle in 500bps lower." This lead Oppenheimer to reduce the Company's price target from $30 to $20. However, Oppenheimer kept its OUTPERFORM rating based on its assessment that Resideo's representations, including those alleged above, rendered its 2019 guidance "reasonable." This included assurances from Resideo's management that margins for the year would in fact improve because at the end of 2019 there "is going to be some improvement that we're going to see on the security margins from where we currently are."

159.    This conflicted with the Individual Defendants' prior representations as to the anticipated benefits which would come from products such as Project GRIP. Consequently, Oppenheimer lowered its price target for the Company's stock.

160.    Following Oppenheimer's report, the Company's stock price went from $15.59 per share at the close of trading on August 12, 2019, to $15.31 per share at the close of trading on August 13, 2019, and then dropped to $14.64 per share at the close of trading on August 14, 2019.

**The Truth is Revealed Regarding the Slowdown in Resideo's RTS and Comfort Businesses**

161.    On October 22, 2019, Resideo announced its Third Quarter 2019 financial results. In the press release announcing the results, Resideo disclosed it would be performing a full financial and operational review of its business:

> Resideo has begun a comprehensive operational and financial review, focused on improving gross margins and optimizing its organizational footprint. The aim of the review is to simplify internal processes that will enable Resideo to be more agile in responding to changing customer and marketplace dynamics. The company has

47

retained industry-recognized experts in supply chain optimization and organizational excellence to assist in the review.

162.    Along with this disclosure, Resideo abruptly announced the departure of its CFO Defendant Ragan, and his replacement by former Constellation Brands CFO, Robert Ryder.

163.    Resideo further disclosed that its Products segment experienced revenue decline due, in part, to a slowdown in the RTS business which was "driven by certain recent regulatory changes and a general slowdown across large OEM customers in the sector." The regulatory changes occurred in July 2019 and were anticipated in advance of that date by distribution channels through which Resideo operated in its RTS business.

164.    Resideo also announced a decline in the Comfort business "primarily due to lower sales volumes in non-connected thermostats." The Company admitted that "poor pre-spin cutover from the prior generation of non-connected thermostats to the T- Series line impacted the adoption of mid-level T-Series thermostats," and "[t]he cutover effects became markedly more pronounced in the third quarter after the prior generation of non-connected thermostats were discontinued."

165.    These statements by Resideo as to its reasoning for declining revenue omitted various facts about the true reasons for the problems at the Company, which would later be revealed.

166.    Additionally, Resideo disclosed that its "new generation of security products and connected thermostats have experienced solid growth" but that "these products have yet to benefit from lifecycle value engineering, adversely impacting full-year 2019 Products & Solutions segment gross margins." The release further said, "the company is actively investing in its value engineering team and expects meaningful improvement to gross margins over the next 18 months."

167.    This statement omitted material facts. Until the end of the Relevant Period, there was no explanation  that the lack of an application of value engineering to the Company's products

resulted from Honeywell leaving Resideo's value engineering team at the time of the Spin-Off "largely depleted." Accordingly, while Resideo could begin hiring new value engineers, it took an average of at least a year and a half for a new employee (even an experienced one) to gain the institutional knowledge needed to make an impact in finding ways for the Company to cut costs throughout the manufacturing process. This press release failed disclose that Resideo could experience "meaningful improvement to gross margins" through this important tool not over an 18- month period, but only beginning near or at the end of that period of time.

168.   In the press release, Resideo also disclosed third quarter EBITDA of $77-79 million, missing analyst expectations of $98-101 million. Resideo further reduced its full year 2019 EBITDA guidance to a range of $330-350 million, down from the top end of $410-430 million that it had previously given and reaffirmed without qualification in numerous prior public statements. Resideo also reduced its full year sales guidance, similarly reaffirmed without qualification in numerous prior public statements, from GAAP revenue growth of 2% to 5% to 2% to 4%.

169.   Nonetheless, the press release boasted that the financial and operational review would "build upon the previously announced cost optimization program, which is on track to achieve approximately $15 million in realized savings in 2019 and $50 million in [] 2020." This representation failed to disclose reasons for Resideo's disappointing results, including low margins, and "slow moving products, as to Resideo's superior competitive position across product categories and robust and innovative product line, despite the repeated representations before and during the Relevant Period. Though not disclosed until after the end of the Relevant Period, this problem was the materialization of the risk caused by Resideo's lack of engineering professionals, a problem increased by the cost optimization program to the extent it led to the mass employment

termination of many of the engineering staff that it had retained.

**The Truth Continues to Emerge**

170.    On November 6, 2019, Resideo issued a press release summarizing the Company's

Third Quarter 2019 financial results. The press release was attached as an exhibit to a Form 8-K,

and confirmed Resideo's disclosures in the October 22, 2019 earnings preview.

171.    On the earnings call held the following day to discuss the results, Resideo provided

additional details about, among other things, the Company's supply chain issues and specifically

its value engineering problems. Defendant Nefkens disclosed for the first time had Resideo

essentially had, as of the beginning of the Spin-Off and through the Relevant Period, no value

engineering teams. Defendant Nefkens stated:

> The first factor was gross margin compression. Most of our value engineering
> stopped prior to our spin-off from Honeywell. In a company like ours, product
> costs like components, raw materials and packaging will need to be optimized
> every year to keep gross margin strong. Value engineering teams do that.
> Before we spun off from Honeywell, these teams were largely depleted, and
> we are seeing the effects of that in our gross margins.

172.    In response to an analyst question about how Resideo had lost value engineering

employees in the Spin-Off (because those employees remained employed with Honeywell)

Nefkens said:

> So look I think the lines were drawn pre-spin sometime back about who was
> coming over and who wasn't. So not certain of exactly how those decisions
> were made. And what I can tell you is that the talent and the value engineering
> that came over was very small compared to what was required. Our business
> is going through a transformation right now from products that are more
> mechanical into products that are more electronic. And we basically did not
> have the right people on the pitch post spin to continue to value engineer those
> products . . .
>
> As you alluded the problem with that is really the value engineering that should
> have been done 12 to 24 months ago we would have started to see the impact
> now. Now that we're restarting that it will take some time as new raw new
> materials new components will have to come in will have to be manufactured.
> We'll have to move all the previous stocks that we have before we start to see

the benefit of that and we expect that to take 12 to 24 months.

173.    Defendant Nefkens admitted for the first time that at the time of the Spin-Off , there was not simply a failure to fully apply value engineering to its products, but Resideo did not have the value engineering staff to address the Company's ongoing supply chain problems. Resideo did not have any value engineers from the time of the Spin-Off because Honeywell took all of them.

174.    In terms of Resideo's near term future EBITDA and margins, Defendant Nefkens also admitted that had Resideo worked earlier to retain value engineering staff to replenish the staff that Honeywell had retained, Resideo would have seen the benefit reflected in the supply chain within 12-24 months.

175.    Next, Defendant Nefkens said, "The second factor is sourcing. We lost some sourcing leverage in direct and indirect materials following the spin-off. We've been working with our suppliers for several months now to rectify that." This is also a significant problem affecting margins, one that is not easily or quickly remediable, and therefore is likely to adversely impact upon margins in the future. Nefkens went on to say that "post-spin inventory write- downs and slow-moving products" "impacted our EBIDTA as well." This disclosure is contrary to all of Individual Defendants prior representations with respect to Resideo's product line.

176.    In an analyst report issued on November 6, 2019, Oppenheimer stated that there had been "significant mis-executions of the business."

177.    In an earnings call held on November 7, 2019 Defendant Nefkens disclosed for the first time certain major ongoing problems that affected the Company's gross margins.

> The first factor was gross margin compression. Most of our value engineering stopped prior to our spin-off from Honeywell. In a company like ours, product costs like components, raw materials and packaging need to be optimized every year to keep gross margin strong. Value engineering teams do that. Before we spun off from Honeywell, these teams were largely depleted, and we are seeing the effects of that in our gross margins" and that seeing any benefit from an effort to rebuild those teams would "take

12 to 24 months.

\* \* \*

The second factor is sourcing. We lost some sourcing leverage in direct and indirect materials following the spin-off. We've been working with our suppliers for several months now to rectify that.

\* \* \*

The third factor is a margin drop associated with the competitive renewal of a contract from a large OEM security customer. This contract was secured in 2017 and first deliveries began a year later, with volume ramp-up in 2019. Contractual customer rebates associated with this contract drove further margin decline this year.

\* \* \*

The fourth factor is the previously mentioned T-Series thermostat transition. This was a transition that began in 2017 from a high-margin product offering to more modern but lower-margin series.

\* \* \*

Finally, post-spin inventory write-downs and slow-moving products impacted our EBITDA as well.

178.    Following these disclosures, the price of Resideo's common stock declined from its closing price of $10.02 per share on November 6, 2019, to close at $9.78 per share on November 7, 2019 on heavy trading volume. As the market further digested the negative news, Resideo's common stock declined further in the subsequent trading days. On November 8, 2019, Resideo's common stock closed at $9.60 per share, and on November 11, 2019, the Company's common stock closed at $9.02 per share.

179.    After the Relevant Period, on December 2, 2019, it was announced that Defendant Nefkens would be leaving his role at the company "to focus on family health issues," staying only long enough until a successor was appointed. Oppenheimer, in its analyst report issued on the same day, said that this news was "a development we view as positive."

180.    On December 11, 2019, Resideo released an "Investor Update" prior to the Imperial Capital 2019 Security Investor Conference. In the presentation, Resideo admitted that "SpinCos often have teething pains due to legacy tie-ins, allocated pre-spin financials, management and

customer turnover, TSA transitions and shareholder churn." The presentation further admitted the Resideo Spin-Off had "additional complexity due to Honeywell determined spin obligations, lack of pre-existing stand-alone business and dramatic profitability shortfalls to estimates."

181.    On the same day, Resideo's new CFO Robert Ryder presented at the investor conference and made numerous statements revealing the Company's severe problems since it came into being. Ryder's comments further indicated the falsity of Resideo's public statements during the Relevant Period. Ryder disclosed that (a) contrary to prior representations as to Resideo having a "strong management operation system" with integrated business units, Honeywell "kind of picked individual pieces up and kind of threw them together and called that products and solutions" to create Resideo, which had "governance ramifications"; i.e., Honeywell took a bunch of products from various business units that did not otherwise have historic-separate P&Ls as stand-alone businesses or independent governance and operational structures and just assigned numbers to them without regard to how they would be integrated to operate as a stand- alone Company; (b) contrary to the prior statements concerning the Company's supposedly innovative products, streamlined manufacturing and robust supply chain, Resideo likely had "too many products," "in too many places," not "in the right places with the right freight lines"; and (c) contrary to Individual Defendants' statements as to Resideo's competitive and innovative products and agility and speed to the market, "[w]e've had new product introduction, execution issues, lack of customer acceptance testing. And we are too slow to identify poor performing new product launches." New product launches were "not completely launched, right, but weren't really accepted by customers, weren't really competitive" and "[w]e had the inventory. And unfortunately, nobody wanted to buy it, which is why we had these inventory write-offs, okay?"

182.    On February 26, 2020, Resideo issued a press release providing fourth quarter 2019

and full year 2019 results. Contrary to repeated representations by Individual Defendants, full year consolidated revenue increased by 3% on a GAAP basis and adjusted EBITDA declined $137 million, or 27%, driven by a 32% reduction in the Products & Solutions division.

183.     Defendant Nefkens, Ryder, and Defendant Teich, the Lead Independent Director, presided over a related earnings call that was held the next day. Defendant Teich made clear that Resideo was not only lacking value engineers during the Relevant Period, but also generally lacked sufficient talented engineers resulting in materially adverse consequences for product development and innovation.

184.     On February 27, 2020, Defendant Teich revealed yet more information indicating that the Individual Defendants were aware that the Company lacked both value engineers and talented engineers in general throughout the Relevant Period, noting that following the Spin-Off, "there was an opportunity for talent improvement in the product development areas of P&S., and some of the lack of that was manifested in our results in 2019. So the problem has been identified."

**The False and Misleading Proxy**

185.     On April 24, 2020 the Company filed a Schedule 14a with the SEC, which contained a Notice of Shareholder Meeting (by order of the Board) and Proxy Statement (the "Proxy").

186.     First, the Proxy stated that:

- Our Code of Business Conduct applies equally to all of our directors, officers and employees, as well as those of our subsidiaries, affiliates and joint ventures.

- Material amendments to, or waivers of, the Code of Business Conduct granted to any of our directors or executive officers will be posted on our

website at www.resideo.com.

- To date, no such amendments have been made or waivers granted.

- Our Code of Business Conduct is drafted to provide guidance to our directors, officers, employees and others covered by the Code of Business Conduct as to what they should and should not do to comply with our policies. The statements contained therein are not representations and should not be relied upon as such by third parties, including shareholders.

187.    Second, the Proxy stated:

> In our first full year as a public company, Resideo faced considerable challenges and took significant actions to improve performance. Through it all, our talented employees have worked tirelessly to deliver trusted and reliable products and technology, and premier brands, to millions of customers around the world. To meaningfully enhance our financial and operational performance, we are undergoing a business transformation to strengthen Resideo's competitive position and enable the company to achieve long-term success and value-creation. We are making changes to reduce our operating costs, while simultaneously making critical investments to improve our new product introductions, value engineering and product management. … We are committed to strong corporate governance practices and policies, as described below, that support effective Board leadership and prudent management practices…[including] Rigorous risk oversight of "enterprise" as well as "product" cybersecurity programs by the Audit and Innovation and Technology Committees… Oversight of our code of business conduct, health, safety and environmental matters, equity employment opportunity and harassment policies and practices by the Nominating and Governance Committee.

188.    Third, the Proxy referred to the "Report of the Audit Committee."  In it, the Company stated:

> The Audit Committee has met and discussed with management and the independent auditor the fair and complete presentation of the Company's financial statements. The Audit Committee has also discussed and reviewed with the independent auditor all matters required to be discussed by applicable requirements of the Public Company Accounting Oversight Board and the SEC. The Audit

Committee has discussed significant accounting policies applied in the financial statements, as well as alternative treatments. Management has represented that the consolidated financial statements have been prepared in accordance with GAAP, and the Audit Committee has reviewed and discussed the audited consolidated financial statements with both management and the independent auditor.

Relying on the foregoing reviews and discussions, the Audit Committee recommended to the Board, and the Board approved, inclusion of the audited consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2019, for filing with the SEC.

189.    The Proxy was false and misleading because, while it assured investors that Resideo's code of business conduct and its audit committee charter were followed during the preceding fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

## FIDUCIARY DUTIES

190.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Resideo and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Resideo in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Resideo and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

191.    Each Individual Defendant owes and continues to owe Resideo, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

192.    The Individual Defendants, because of their positions of control and authority as

directors and/or officers of Resideo, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Resideo, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

193.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)    remain informed as to how Resideo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

194.    The Individual Defendants, as officers and/or directors of Resideo, were bound by

the Company's Code of Business Conduct[1] (the "Code of Conduct") which required the following:

> Integrity and Compliance is central to everything that we do here at Resideo. Acting with the highest standards of ethical conduct is essential to creating and maintaining trust between the company and its employees, customers, shareholders, and suppliers.
>
> We recognize that we cannot achieve our business objectives and continue to be invited into customer homes, nor can we show that we are vested in our people, unless we operate from an unwavering foundation of integrity and compliance.
>
> We created this Code to provide our employees with an overview of the company's expectations for acting with the highest ethical standards and in compliance with the law.
>
> **MARKET TRUTHFULLY AND ACCURATELY**
>
> When we tell the world about our products and services, we must ensure that we are truthful and accurate in our advertising, product packaging, marketing or sales materials, and that we do not mislead our consumers. This is also true when we make statements about our competitors or comparisons between our competitors' products and ours.
>
> **KEEP HONEST, ACCURATE BOOKS AND RECORDS**
>
> As a publicly traded U.S. company, Resideo must comply with securities laws that require Resideo to disclose accurate and complete material information regarding its business, financial condition and results of operations. We must always work to ensure that our financial reporting and disclosures are full, fair, accurate, timely and understandable. This includes complying with all financial internal controls and raising any concerns about the accuracy of our records.
>
> In addition to ensuring the integrity of financial records, we expect employees to make sure that all other company information is recorded and reported accurately. This includes, but is not limited to, information concerning the company's employees, research and development activities, strategic plans, travel and expense claims, and general operations.

195.    In addition to these duties, the Individual Defendants who served on the Audit

Committee during the Relevant Period, Defendants Deninger, Lazar, and Wienbar ("the Audit

---

[1] See Resideo Code of Business Conduct:
https://s23.q4cdn.com/522312308/files/doc_governance/Code-of-Conduct.pdf

Committee Defendants"), owed specific duties to Resideo under the Audit Committee Charter (the

"Audit Charter").[2] Specifically the Audit Charter provided for the following responsibilities of the

Audit Committee Defendants to:

> Provide assistance to the Board in fulfilling its responsibilities relating to oversight as set forth below. The Committee shall oversee … the integrity of the Company's financial statements, its accounting and financial reporting practices and internal accounting and financial controls system… the quarterly independent auditor reviews, submission of Form 10-Q filings, earnings press releases, and the annual independent audit of the Company's financial statements… the performance of the Company's internal audit function and its system of internal controls…; compliance with legal and regulatory requirements…;the implementation and effectiveness of the Company's disclosure controls and procedures…; the evaluation of the Company's policies for risk management and assessment, including material litigation instituted against the Company.

> \*\*\*

> The Committee shall…review other matters related to the conduct of the audit which are communicated to the Committee under generally accepted auditing standards and rules of the Securities and Exchange Commission (the "SEC")… Based on the review…the Committee will advise the Board whether it recommends that the audited financial statements be included in the Company's Annual Report on Form 10-K. Additionally, the Committee will prepare the Committee report to be included in the Company's proxy statement in accordance with SEC rules. Review and discuss with management and the independent auditors, prior to the filing thereof, the Company's annual and interim financial results (including Management's Discussion and Analysis) to be included in Forms 10-K and 10-Q, respectively, and the matters required to be communicated to the Committee under generally accepted auditing standards and rules of the SEC…Discuss with management the Company's earnings releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), and each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance… Review (a) the internal control report prepared by management, including management's assessment of the effectiveness of the Company's internal control over financial reporting, (b) any significant deficiencies or material weaknesses

---

[2] See Resideo Audit Committee Charter at:
https://s23.q4cdn.com/522312308/files/doc_governance/Audit-Committee-Charter.pdf

in the design or operation of the Company's internal control over financial reporting, (c) any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting, (d) any changes in the Company's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, internal control over financial reporting.

## BREACHES OF DUTIES

196.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Resideo, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

197.    The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was encountering, in connection with the Spin-Off. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Resideo substantial damage.

198.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Resideo's public statements and internal control function.

199.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Resideo, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the

other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Resideo has expended, and will continue to expend, significant sums of money.

## DAMAGES TO RESIDEO

200.     The improper accounting practices have exposed the Company to myriad reputation and financial damages, including but not limited to:

(a)     Possible restatements and goodwill impairments;

(b)     Liability arising from the Securities Class Action;

(c)     The loss of credibility with customers and suppliers; and

(d)     Legal and accounting costs associated with litigation, investigations and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

201.     Plaintiff brings this action derivatively and for the benefit of Resideo to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Resideo, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

202.     Resideo is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

203.     Plaintiff is, and has been continuously at all relevant times, a stockholder of Resideo. Plaintiff will adequately and fairly represent the interests of Resideo in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

204.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

205.    A pre-suit demand on the Board of Resideo is futile and, therefore, excused. At the time of filing of this action, the Board consists of Individual Defendants Deninger, Fradin, Lazar, Richardson, Teich, and Wienbar (the "Director Defendants"), along with Jay Geldmacher, Cynthia Hostetler, and Brian Kushner who are not defendants in these proceedings. Plaintiff needs only to allege demand futility as a majority of the Directors who are on the Board at the time this action is commenced.

206.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

207.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

208.    Demand on Defendant Deninger is futile because Defendant Deninger has served as a Company director since 2018. He also serves as the Chair of the Company's Finance Committee and as a member of the Audit Committee. He has received and continues to receive

compensation for his role as a director as described herein. Defendant Deninger signed and thus personally made the false and misleading statements in the 2018 10-K.

209.    Demand on Defendant Fradin is futile because Defendant Fradin has served as the Chairman of the Board since 2018. Defendant Fradin has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Fradin signed and thus personally made the false and misleading statements in the 2018 10-K.

210.    Demand on Defendant Lazar is futile because Defendant Lazar has served as a Company director since 2018. He also serves as the Chair of the Company's Audit Committee. Defendant Lazar has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Lazar signed and thus personally made the false and misleading statements in the 2018 10-K.

211.    Demand on Defendant Richardson is futile because Defendant Richardson has served as a Company director since 2018. She also serves as the Chair of the Company's Nominating and Governance Committee. Defendant Richardson has received and continues to receive compensation for her role as a director as described herein. Furthermore, Defendant Richardson signed and thus personally made the false and misleading statements in the 2018 10-K.

212.    Demand on Defendant Teich is futile because Defendant Teich has served as the Company's Lead Independent Director since 2018. He also serves as the Chair of the Company's Innovation and Technology Committee and the Strategic & Operational Committee and as a member of the Compensation Finance, and Nominating and Governance Committees. Defendant Teich has received and continues to receive compensation for his role as a director as described herein. During the Company's conference call held on February 27, 2020, Defendant Teich

indicated his awareness of the Company's lack of value engineers following the Spin-Off, further demonstrating his complicity in the scheme to conceal material information from the market. Furthermore, Defendant Teich signed and thus personally made the false and misleading statements in the 2018 10-K.

213.    Demand on Defendant Wienbar is futile because Defendant Wienbar has served as a Company director since 2018. She also serves as the Chair of the Company's Compensation Committee and as a member of the Audit Committee. Defendant Wienbar has received and continues to receive compensation for her role as a director as described herein. Furthermore, Defendant Wienbar signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Wienbar breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

214.    As trusted Company directors, the above directors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Directors breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

215.    The Director Defendants have longstanding business and personal relationships with each other and the Individual Defendants which means they cannot act independently and in the best interests of the Company. Before the Spin-Off, Individual Defendants Nefkens, Ragan, and Fradin each worked at Honeywell at the same time as each other, including as CEO of Honeywell's Homes Business, as CFO of Honeywell Homes, and as vice chairman of Honeywell,

respectively. These conflicts mean these defendants could not adequately monitor the Company's operations and internal controls, and call into question the Individual Defendants' conduct. Thus, demand upon the Director Defendants would be futile.

216.     Pursuant to the Company's Audit Committee Charter, the Audit Committee Individual Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Individual Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Individual Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

217.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director-Individual Defendants face a substantial likelihood of liability and demand is futile as to them.

218.     Resideo has been and will continue to be exposed to significant losses due to the

wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Resideo any part of the damages Resideo suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

219.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

220.    The acts complained of herein constitute violations of fiduciary duties owed by Resideo's officers and directors, and these acts are incapable of ratification.

**Insurance Considerations**

221.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Resideo. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Individual Defendants were to sue themselves or certain officers of Resideo, there would be no directors' and officers' insurance protection. Accordingly, the Director Individual Defendants cannot be

expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Individual Defendants is futile and, therefore, excused.

222.    If there is no directors' and officers' liability insurance, then the Director Individual Defendants will not cause Resideo to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

223.    Thus, for all the reasons set forth above, all of the Director Individual Defendants, and, if not all of them, at least a majority of Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

224.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

226.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

67

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

227.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

228.    The Proxy also stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct.  The Proxy was also false and misleading because, despite assertions to the contrary, Resideo's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

229.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2020 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

230.    The false and misleading elements of the annual Proxy led to the re-elections of all of the Director Individual Defendants, allowing them to continue breaching their fiduciary duties

68

to Resideo.

231.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies

232.    Plaintiff on behalf of Resideo has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

233.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.    The Individual Defendants, by virtue of their positions with Resideo and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Resideo and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Resideo to engage in the illegal conduct and practices complained of herein.

235.    Plaintiff on behalf of Resideo has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

236.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Resideo's business and affairs.

238.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

239.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Resideo.

240.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

241.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

242.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements Prior to the Spin-Off, and during the Relevant Period, that assured investors that Resideo was on track to flourish as a stand-alone company, yet failed to disclose from the time Resideo came into existence, major problems which included (1) the Company had few to no expert engineering personnel needed to control the costs of certain components, as these professionals had been taken by Honeywell prior to the Spin-Off; (2) the Company faced problems with its supply chains and inventory, resulting in backorders and product shortages; (3) certain of the Company's security products, as well as the Company's T-Series line of thermostats, which made up the core of the Company's residential thermostats portfolio, were rapidly becoming obsolete in the face of competing products that were technologically advanced; (4) the Company's TCC App, which applied to T-Series thermostats and other types of thermostats, had serious problems; (5) Contractual liabilities resulted from the Company's failure to deliver on contracts with certain OEMs, including ADT; (6) as a result of the Spin-Off, the Company lost all of the advantages that had come with operating as a part of Honeywell, including access to Honeywell's considerable

bargaining power and economies of scale; (7) the Company lacked the professionals, expertise, or technology to address these problems, or to develop products in the pipeline (including promises Individual Defendants made regarding to those products), including Project GRIP, and Project STORM; and (8) the Company lacked managerial and financial cohesion, resulting from Resideo's nature as an amalgamation of largely of disconnected business segments that did not have a history of operating together.

243.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

244.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

245.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the

price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

246.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

247.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Resideo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

248.     Plaintiff on behalf of Resideo has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

249.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250.     By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Resideo.

251.     The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Resideo tied to the performance or artificially inflated valuation of Resideo, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

252.     Plaintiff, as a stockholder and a representative of Resideo, seeks restitution from the Director Individual Defendants and seeks an order from this Court disgorging all profits—

including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

253.   Plaintiff on behalf of Resideo has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

254.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

255.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Resideo will lose financing from investors and business from future customers who no longer trust the Company and its products.

256.   Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

257.   Plaintiff on behalf of Resideo has no adequate remedy at law.

## PRAYER FOR RELIEF

258.   **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Resideo, and that Plaintiff is an adequate representative of the Company;

B.   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Resideo;

C.   Determining and awarding to Resideo the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and

severally, together with pre- and post-judgment interest thereon;

D.      Directing Resideo and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Resideo and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)      A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)      A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

3)      Awarding Resideo restitution from Individual Defendants;

4)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

5)      Granting such other and further relief as the Court may deem just and proper.

Dated: August 12, 2020                    Respectfully submitted,

Of Counsel:                               **FARNAN LLP**

Gregory M. Nespole                        /s/ Michael J. Farnan
**LEVI & KORSINSKY, LLP**                 Brian E. Farnan (#4089)
55 Broadway, 10th Floor        Michael J. Farnan (#5165)
New York, NY 10006                        919 N. Market Street, 12th Floor
T. 212.363.7500                           Wilmington, Delaware 19801
F. 212.363.7171                           (302) 777-0300
gnespole@zlk.com                          bfarnan@farnanlaw.com
                                          mfarnan@farnanlaw.com
                                          *Attorneys for Plaintiff Daniel Sanclemente*